Argued November 12, 1929; reversed and remanded January 14, 1930

CHARLES T. SMITH ET AL. *v.* P. J. McGOWAN & SONS, INC., ET AL.

(284 Pac. 189)

For appellants there was a brief over the name of *Mr. Johnston Wilson* with an oral argument by *Mr. Elton Watkins*.

For respondents there was a brief and oral argument by *Mr. Leslie E. Crouch*.

BELT, J.  Plaintiffs, who are alleged to be part-
ners engaged in the commercial enterprise of seining
for salmon in the Columbia river, seek to recover dam-
ages from defendants on account of an alleged inter-
ference with their fishing rights.  Plaintiffs had judg-
ment and defendants appeal.  Reversed.  The follow-
ing plat may be helpful in understanding the issue:

Plaintiffs allege that defendants, between July 20, 1926, and August 25, 1926, wrongfully, wantonly and maliciously interfered with their seining operations. Among the wrongful acts charged are (1) cutting plaintiff's seines; (2) ramming plaintiff's gas boat and attempting to sink it; (3) assaulting and threatening with violence employes of plaintiff for the purpose of driving them off the seining grounds; and (4) anchoring boats in the way of plaintiff's seines to prevent landing. By reason of such alleged interference, plaintiffs asked $11,500 as compensatory damages and punitive damages in the sum of $40,000.

In a separate answer, the defendant P. J. McGowan & Sons, a corporation engaged in the business of seining for fish and operating salmon canneries along the Columbia river, aside from admitting its incorporation, denied generally the allegations of the complaint. As a further and separate answer, defendant alleged that plaintiffs were not operating their drag seines in a lawful manner in that they were seining on a location not specified in the license issued by the master fish warden to the plaintiff, F. R. Rogers, viz, in front of lot four (4), section six (6), township two (2) north, range eight (8) east of the Willamette meridian, and lot one (1), section one (1), township two (2) north, range seven (7) east of the Willamette meridian.

As a second and further answer and counter-claim defendant corporation alleges it is the owner of lots 2 and 3, section 6, township 2, north of range 8 east, Willamette meridian, Hood River county, state of Oregon, and that it had a license to land seines thereon. Defendant alleges that, on February 15, 1926, it entered into an agreement with defendant Harry Kruckman wherein he was permitted to operate seines

on such fishing grounds. In consideration for such fishing privileges, Kruckman agreed to deliver at market price his entire catch of fish to the defendant's cannery. Defendant, as a basis for its counter-claim, alleged that plaintiffs wilfully, wantonly, and maliciously committed certain wrongful acts similar in nature to those charged by plaintiffs, which resulted in interference with defendant's supply of fish and, furthermore, that plaintiffs, instead of fishing upon the location designated in the license issued to Rogers, operated seines "either on the land between the meander line and the edge of the water fronting said lots 2 and 3, section 6, or on lands lying between the meander line and the edge of the water fronting Leonard's island, which lies westerly of and down stream from said lots 2 and 3." Defendant asked for compensatory and punitive damages aggregating $24,171.47.

Defendants Harry Kruckman and Earl McGowan joined in a separate answer admitting the incorporation of defendant P. J. McGowan & Sons and the allegation that plaintiffs "were associated together, as partners, carrying on commercial fishing by means of seines on the Columbia river," but denied generally all other allegations of the complaint.

As a further and separate answer these defendants, in substantially the same language as that used by McGowan & Sons, charged that plaintiffs were not operating drag seines on the location specified in the license, but were trespassing on the fishing rights of McGowan & Sons.

Defendant Harry Kruckman, for a second and separate answer and by way of counter-claim, alleged that P. J. McGowan & Sons had a license to operate a

drag seine on lots 2 and 3 and that about the first of July, 1926, pursuant to an agreement with the defendant company, he commenced fishing on such seining grounds, but that plaintiffs wrongfully, wantonly, and maliciously interfered with the operation of his drag seines. Defendant alleges acts of violence and interference similar to those charged by the plaintiffs and says that, by reason thereof, his catch of fish was greatly diminished, to his damage in the sum of $23,000. Defendant also demands $20,000 as punitive damages.

The cause was put at issue by the reply of plaintiffs who denied generally all affirmative matter alleged by defendants. Verdict and judgment were had in favor of plaintiffs and against defendants for $9,000 compensatory damages and $6,250 punitive damages. Defendants appeal.

It is well at this juncture to note that the seining operations of both parties were on the Oregon side of the Columbia river about two miles east of Cascade Locks, and that the McGowan property (lots 2 and 3) adjoined on the east the seining operations of the plaintiffs (lots 1 and 4)—such property being leased by Rogers from L. A. Clark on May 15, 1926, for the fishing seasons of 1926 and 1927. What is designated in the record as "Leonard's island" is a sand bar two or three miles in length connecting with the McGowan property and extending down stream in a westerly direction in front of lots 1 and 4, the Clark property. The lower end of the sand bar forms an island. It is very shallow at low water between the Clark property and the island. According to the testimony of the plaintiff Smith there was a foot of water at low stage. We have found no testimony that the Clark property at low water is connected with the island by any continuous strip of land. Seines could not be oper-

ated between the Clark property and the island, so plaintiffs were obliged to and did use the beach on the north side of the westerly end of the island to land their seines.

At the threshold of the case plaintiffs are met with the vital objections, first, that there is no evidence of a partnership, and, second, that, if there was a partnership, it was engaged in an illegal enterprise, as the plaintiff Smith, being a resident of Washington, was not permitted by statute to fish by drag seines in this state. Section 9 of chapter 313, General Laws of Oregon for 1925, provides:

"That it shall be unlawful for any person to fish or take for sale or profit any salmon * * in any of the rivers or waters over which the states of Oregon and Washington have concurrent rights and concurrent jurisdiction, unless such person be a citizen of the United States and has been for one year immediately prior to the time he makes applicatiion, an actual resident of the state in which he seeks to obtain his license; * *."

There can be no question that if Smith had applied for a license to operate a drag seine in this state it could not legally have been issued to him, since he admittedly resided in Beaverton, Washington. Without doubt he undertook to avoid the force and effect of the above statute by entering into a joint business enterprise with the plaintiff Rogers. Let us examine the evidence to ascertain whether, in fact, plaintiffs entered into a partnership relationship. It is their contention that Rogers put into this partnership business his leasehold interests in the Clark property and the license which had been issued to him by the state of Oregon, and that, in consideration therefor, he was to receive 2 per cent of the anticipated profits derived

from the sale of fish. It was expressly agreed that he was not to share in the losses, if any resulted. Plaintiff Smith was to put into the business his skill and experience as a fisherman and certain fishing gear and equipment. The evidence shows without contradiction that Rogers never went upon the fishing grounds in 1926 and that he never undertook to exercise any control or supervision over the seining operations. Smith was the fisherman. Rogers, in referring to the lease obtained from Clark, said, "Well, I guess Smith found the man and fixed it up." Rogers made the initial payment of $10 on the lease, but the balance was paid by Smith. Rogers said, "I told Smith to pay it," but that he never knew whether he had done so. Rogers, in answer to the question, "You did not visit the fishing grounds nor participate in the operations in any way, shape or form," answered, "No, it was not necessary." Smith testified about the alleged partnership agreement, as follows:

"Q. As a matter of fact, Mr. Rogers was paid so much because he lived in Oregon and got the license and that was about the situation, isn't it?

"A. We had an agreement that I was to pay the expenses, that I was to hire the men and use my outfit and he was to get 2 per cent of the cash, a verbal agreement. *We have never figured that up.*

"Q. He was to get 2 per cent of the gross receipts or net profits?

"A. Of the gross receipts.

"Q. The gross receipts?

"A. Yes.

"Q. That is, every year you would give him 2 per cent of all the money you took in; is that right?

"A. Yes, but then there was an understanding, too, if there was no profits I didn't need to pay him that, in case there was no profits; in case the profits didn't justify. That was the only agreement between us.

"Q. In other words, you were going to give him 2 per cent of everything you took in, provided the net profits justified you paying that?

"A. Yes."

■■ In our opinion the evidence in this case does not disclose a partnership relation, nor do we think that the parties intended to create such status. The slight participation in the profits by Rogers, together with other facts and circumstances surrounding this transaction, does not indicate a community of interest in the business—rather that he was to be compensated out of such business for certain fishery rights possessed by him by virtue of his being a citizen and resident of this state. All that Rogers did in this business enterprise was to obtain a license for the purpose of enabling Smith, a non-resident, to fish in this state. It is even doubtful whether Rogers was to get 2 per cent of the profits. In the light of the evidence it might well be argued that Rogers was to get 2 per cent of the gross receipts. Assuming that he was to get 2 per cent of the profits, this, of itself, would not constitute a partnership. *H. H. Worden & Co. v. Beals et al.,* 120 Or. 66 (250 P. 375); *Hanthorn v. Quinn,* 42 Or. 1 (69 P. 817). Certainly such would not be true if his percentage of the profits was merely in compensation for his fishery rights. 20 R. C. L. 825; 47 C. J. 669; *Stephens v. Neely,* 161 Ark. 114 (255 S. W. 562, 45 A. L. R. 1236). Tested by the law of partnership as announced by this court in *H. H. Worden & Co. v. Beals et al.,* supra; *Northwestern Transfer Co. v. Investment Co.,* 81 Or. 75 (158 P. 281); *Hanthorn v. Quinn,* supra, plaintiffs have not shown a partnership.

■■ If it was a partnership, it seems to us that the only reasonable inference which can be drawn from the

undisputed evidence is that it was an illegal enterprise in that its object and purpose was to enable Smith to avoid the plain provisions of the above statute. If courts countenance such agreements the statute might as well be repealed so far as protecting resident fishermen is concerned. Since there was no dispute in the testimony relative to the alleged partnership agreement, a question of law was presented to the court for determination. *Hanthorn v. Quinn,* supra.

In *State v. Catholic,* 75 Or. 367 (147 P. 372), the defendant, a resident of California, was convicted of fishing for salmon with a gill net in the waters of the Columbia river, without first having obtained a license therefor. The law at that time (§ 5293, L. O. L.) restricted the right of fishing to bona fide residents of Oregon, Washington and Idaho. The constitutionality of the act was upheld. The court said:

"The evident object of the enactment was to protect Oregon fishermen from men engaged in that business who came to this state when the season opened, pursued their calling, and when the season closed returned to their homes to ply their occupation in, other waters, thereby rapidly depleting the supply of a valuable food product which, if properly cared for, could be reasonably conserved to the advantage of resident fishermen.

\* \* \* \* \*

"The qualified ownership of roving fish in navigable waters within a state is in that sovereignty in trust for its citizens alone. (Citing *State v. Hume,* 52 Or. 1 (95 P. 808.)

\* \* \* \* \*

"Nonresidents of Oregon who may be citizens of the United States and of another state have no inherent right to take or catch migratory fish in the navigable waters of Oregon after a statute has been enacted by this state prohibiting the exercise of the

privilege. Hence, § 5298, L. O. L., does not contravene the amendment of the federal constitution invoked to annul it."

We are not unmindful that Smith was a resident of the state of Washnigton which had concurrent jurisdiction over the Columbia river. If Smith was licensed in Washington to fish in such river, this right could not be denied by legislative enactment of Oregon. Fishing by gill nets and by seines are entirely different in the method of operation. A seine is classified by the state fish commission, under authority of statute, as a fixed fishing gear. In order to obtain a license to seine it is necessary that the applicant have title or interest in real property upon which to land the seines. In the instant case Smith proposed to catch fish from the waters of the Columbia river and to land his seine upon the Oregon side of the river. Certainly it was within the province of the legislature to provide that, before he could exercise such right, he must be licensed in this state. The right of the state to make such discrimination in favor of its own citizens and against citizens of other states was upheld in *Alsos v. Kendall*, 111 Or. 359 (227 P. 286), citing, among other cases, *Crane v. New York*, 239 U. S. 195 (60 L. Ed. 218, 36 S. Ct. 85). The Alsos case construed the statute after it was amended restricting the right to fish in the Columbia river to residents of the state of Oregon.

When it appeared to the court, from the testimony, that plaintiffs' right to recover damages was predicated upon an illegal agreement, it should have excluded any evidence in support thereof. As held in *Ah Doon v. Smith*, 25 Or. 89 (34 P. 1093—cited with approval in *Pacific Livestock Co. v. Gentry*, 38 Or. 275 (61 P. 422, 65 P. 597—), if the illegality of a contract

sued on appear from the testimony of plaintiffs' witnesses, although not pleaded in the answer, the court, of its own motion, ought to dismiss the action.

The conclusion reached makes it unnecessary to consider numerous other assignments of error, some of which we think would also demand reversal.

However, since defendants, upon the cause being remanded, are entitled to proceed on their counter-claim, it is deemed proper to discuss briefly the fishing rights of defendants on this island.

When plaintiffs first began seining on the island they apparently acted under the erroneous belief that the eastern boundary of their river frontage was marked by an extension of the east line of lot 4 to low water mark indicated on the plat by the line c to p. Defendant McGowan & Sons immediately filed in the federal court an injunction suit to restrain Rogers from interference with its fishery right. Later the defendant Kruckman brought a similar suit in such court to restrain plaintiff Smith from interference with his rights obtained by virtue of his agreement with McGowan & Sons. In a preliminary restraining order the federal court enjoined the plaintiffs from landing their seines east of the line designated on the plat by line c to s. A second preliminary injunction order by the federal court fixed the eastern boundary line of plaintiffs' river frontage as a line drawn north-westerly at an angle of north 35 degrees west from the common meander corner of lots 3 and 4 as indicated on the plat by dotted line c to o. This line was in keeping with the general rule announced in this state that the apportionment of river frontage of a riparian owner on a navigable stream is to be determined by an exten-sion of the side lines of his property at right angles to the thread of the stream. *Montgomery v. Shaver,*

40 Or. 244 (66 P. 923). On August 18, 1926, Kruckman obtained from the state of Oregon a lease purporting to give him the sole and exclusive privilege of operating seines upon "all river bed lands between ordinary low and ordinary high water lines in the Columbia river lying in front of and adjoining lots 2 and 3 * * * and all of the lands known as Leonard's island lying down stream and adjoining said described riverbed lands, during the lawful fishing seasons of the period beginning with the issuance of said license or licenses, and ending March 1, 1927; * * *." Upon having obtained this lease from the state, defendants McGowan & Sons & Kruckman filed supplemental complaints in the federal courts setting forth such fact. Thereafter, upon stipulation of the parties, the federal court entered final decrees enjoining the plaintiffs from operating their seines or trespassing upon any part of "Leonard's island."

■ Even if it be conceded that the shore line of the Clark property would not extend to and was not a part of Leonard's island and that plaintiffs had no fishery rights on the island, it does not follow that the defendants, prior to the execution of the lease by the state of Oregon, were in a position to complain. They had no rights in the river frontage west of the final boundary line adjudicated in the federal court. The title to the island was vested in the state. 45 C. J. 564; 27 R. C. L. 1375; *Hauge v. Walton et ux.*, 72 Wash. 554 (131 P. 248).

■ Whatever damages, if any, defendants sustained prior to the lease should be determined by whether the plaintiffs interfered with their fishery rights east of the line drawn at a right angle to the thread of the stream as adjudicated by the federal

court. However, if plaintiffs, in good faith and in reliance upon the boundary line as fixed in the temporary restraining order, invaded defendants' fishery rights east of the true boundary line represented on plat as line c to o, such would be proper to consider by the jury relative to the question of punitive damages, but their good faith would be immaterial so far as compensatory damages are concerned. If, in fact, plaintiffs invaded the rights of the defendants, they acted at their peril and would be obliged to respond in damages which directly and proximately flowed from such wrongful acts. Defendants are entitled to a direct and positive instruction as to the western boundary of their river frontage.

While the records of proceedings had in the federal court were not admissible to establsh the plea of res adjudicata (*Perdue v. Ward*, 88 W. Va. 371 (106 S. E. 874, 14 A. L. R. 539) ; *Piro v. Shipley*, 33 Pa. Super. Ct. Rep. 278; *Kennon v. Brooks-Scanlon Co.*, 132 La. 515 (61 So. 555) ; *Hampton v. Cope*, 144 Ky. 720 (133 S. W. 937), since such proceedings were separate and distinct from the action at bar, no damages being asked in the injunction suits, the records were admissible as conclusive evidence of the particular issue adjudicated in the federal court, namely, the river frontage boundary between the McGowan and Clark properties. *Farmers & Fruit-Growers Bank v. Davis*, 93 Or. 655 (184 P. 275).

The judgment of the lower court is reversed and the cause remanded with directions to proceed not inconsistent with this opinion.

REVERSED AND REMANDED.

COSHOW, C. J., and BEAN and HAMILTON, JJ., concur.